# SUPREME COURT OF THE UNITED STATES

## LOS ANGELES COUNTY, CALIFORNIA, ET AL. *v.* MAX RETTELE ET AL.

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 06–605.   Decided May 21, 2007

PER CURIAM.

Deputies of the Los Angeles County Sheriff's Department obtained a valid warrant to search a house, but they were unaware that the suspects being sought had moved out three months earlier. When the deputies searched the house, they found in a bedroom two residents who were of a different race than the suspects. The deputies ordered these innocent residents, who had been sleeping unclothed, out of bed. The deputies required them to stand for a few minutes before allowing them to dress.

The residents brought suit under Rev. Stat. §1979, 42 U. S. C. §1983, naming the deputies and other parties and accusing them of violating the Fourth Amendment right to be free from unreasonable searches and seizures. The District Court granted summary judgment to all named defendants. The Court of Appeals for the Ninth Circuit reversed, concluding both that the deputies violated the Fourth Amendment and that they were not entitled to qualified immunity because a reasonable deputy would have stopped the search upon discovering that respondents were of a different race than the suspects and because a reasonable deputy would not have ordered respondents from their bed. We grant the petition for certiorari and reverse the judgment of the Court of Appeals by this summary disposition.

## I

From September to December 2001, Los Angeles County

Per Curiam

Sheriff's Department Deputy Dennis Watters investigated a fraud and identity-theft crime ring. There were four suspects of the investigation. One had registered a 9-millimeter Glock handgun. The four suspects were known to be African-Americans.

On December 11, Watters obtained a search warrant for two houses in Lancaster, California, where he believed he could find the suspects. The warrant authorized him to search the homes and three of the suspects for documents and computer files. In support of the search warrant an affidavit cited various sources showing the suspects resided at respondents' home. The sources included Department of Motor Vehicles reports, mailing address listings, an outstanding warrant, and an Internet telephone directory. In this Court respondents do not dispute the validity of the warrant or the means by which it was obtained.

What Watters did not know was that one of the houses (the first to be searched) had been sold in September to a Max Rettele. He had purchased the home and moved into it three months earlier with his girlfriend Judy Sadler and Sadler's 17-year-old son Chase Hall. All three, respondents here, are Caucasians.

On the morning of December 19, Watters briefed six other deputies in preparation for the search of the houses. Watters informed them they would be searching for three African-American suspects, one of whom owned a registered handgun. The possibility a suspect would be armed caused the deputies concern for their own safety. Watters had not obtained special permission for a night search, so he could not execute the warrant until 7 a.m. See Cal. Penal Code Ann. §1533 (West 2000). Around 7:15 Watters and six other deputies knocked on the door and announced their presence. Chase Hall answered. The deputies entered the house after ordering Hall to lie face down on the ground.

The deputies' announcement awoke Rettele and Sadler. The deputies entered their bedroom with guns drawn and ordered them to get out of their bed and to show their hands. They protested that they were not wearing clothes. Rettele stood up and attempted to put on a pair of sweat-pants, but deputies told him not to move. Sadler also stood up and attempted, without success, to cover herself with a sheet. Rettele and Sadler were held at gunpoint for one to two minutes before Rettele was allowed to retrieve a robe for Sadler. He was then permitted to dress. Rettele and Sadler left the bedroom within three to four minutes to sit on the couch in the living room.

By that time the deputies realized they had made a mistake. They apologized to Rettele and Sadler, thanked them for not becoming upset, and left within five minutes. They proceeded to the other house the warrant authorized them to search, where they found three suspects. Those suspects were arrested and convicted.

Rettele and Sadler, individually and as guardians ad litem for Hall, filed this §1983 suit against Los Angeles County, the Los Angeles County Sheriff's Department, Deputy Watters, and other members of the sheriff's department. Respondents alleged petitioners violated their Fourth Amendment rights by obtaining a warrant in reckless fashion and conducting an unreasonable search and detention. The District Court held that the warrant was obtained by proper procedures and the search was reasonable. It concluded in the alternative that any Fourth Amendment rights the deputies violated were not clearly established and that, as a result, the deputies were entitled to qualified immunity.

On appeal respondents did not challenge the validity of the warrant; they did argue that the deputies had con-ducted the search in an unreasonable manner. A divided panel of the Court of Appeals for the Ninth Circuit re-versed in an unpublished opinion. 186 Fed. Appx. 765

(2006). The majority held that

> "because (1) no African-Americans lived in [respondents'] home; (2) [respondents], a Caucasian couple, purchased the residence several months before the search and the deputies did not conduct an ownership inquiry; (3) the African-American suspects were not accused of a crime that required an emergency search; and (4) [respondents] were ordered out of bed naked and held at gunpoint while the deputies searched their bedroom for the suspects and a gun, we find that a reasonable jury could conclude that the search and detention were 'unnecessarily painful, degrading, or prolonged,' and involved 'an undue invasion of privacy,' *Franklin v. Foxworth*, 31 F. 3d 873, 876 (9th Cir. 1994)." *Id.,* at 766.

Turning to whether respondents' Fourth Amendment rights were clearly established, the majority held that a reasonable deputy should have known the search and detention were unlawful.

Judge Cowen dissented. In his view the deputies had authority to detain respondents for the duration of the search and were justified in ordering respondents from their bed because weapons could have been concealed under the bedcovers. He also concluded that, assuming a constitutional violation, the law was not clearly established.

The Court of Appeals denied rehearing and rehearing en banc.

## II

Because respondents were of a different race than the suspects the deputies were seeking, the Court of Appeals held that "[a]fter taking one look at [respondents], the deputies should have realized that [respondents] were not the subjects of the search warrant and did not pose a threat to the deputies' safety." *Ibid.* We need not pause

long in rejecting this unsound proposition. When the deputies ordered respondents from their bed, they had no way of knowing whether the African-American suspects were elsewhere in the house. The presence of some Caucasians in the residence did not eliminate the possibility that the suspects lived there as well. As the deputies stated in their affidavits, it is not uncommon in our society for people of different races to live together. Just as people of different races live and work together, so too might they engage in joint criminal activity. The deputies, who were searching a house where they believed a suspect might be armed, possessed authority to secure the premises before deciding whether to continue with the search.

In *Michigan* v. *Summers*, 452 U. S. 692 (1981), this Court held that officers executing a search warrant for contraband may "detain the occupants of the premises while a proper search is conducted." *Id.,* at 705. In weighing whether the search in *Summers* was reasonable the Court first found that "detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant." *Id.*, at 703. Against that interest, it balanced "preventing flight in the event that incriminating evidence is found"; "minimizing the risk of harm to the officers"; and facilitating "the orderly completion of the search." *Id.,* at 702–703; see *Muehler* v. *Mena*, 544 U. S. 93 (2005).

In executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search. *Id.,* at 98–100; see also *id.,* at 103 (KENNEDY, J., concurring); *Summers*, *supra*, at 704–705. The test of reasonableness under the Fourth Amendment is an objective one. *Graham* v. *Connor*, 490 U. S. 386, 397 (1989) (addressing the reasonableness of a seizure of the person). Unreasonable actions include the use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and

unnecessary period of time. *Mena*, *supra*, at 100; *Graham*, *supra*, at 396–399.

The orders by the police to the occupants, in the context of this lawful search, were permissible, and perhaps necessary, to protect the safety of the deputies. Blankets and bedding can conceal a weapon, and one of the suspects was known to own a firearm, factors which underscore this point. The Constitution does not require an officer to ignore the possibility that an armed suspect may sleep with a weapon within reach. The reports are replete with accounts of suspects sleeping close to weapons. See *United States* v. *Enslin*, 327 F. 3d 788, 791 (CA9 2003) ("When [the suspect] put his hands in the air and began to sit up, his movement shifted the covers and the marshals could see a gun in the bed next to him"); see also *United States* v. *Jones*, 336 F. 3d 245, 248 (CA3 2003) (suspect kept a 9-millimeter Luger under his pillow while he slept); *United States* v. *Hightower*, 96 F. 3d 211 (CA7 1996) (suspect kept a loaded five-shot handgun under his pillow); *State* v. *Willis*, 36,759–KA, p. 3 (La. App. 4/9/03), 843 So. 2d 592, 595 (officers "pulled back the bed covers and found a .38 caliber Model 10 Smith and Wesson revolver located near where defendant's left hand had been"); *State* v. *Kypreos*, 115 Wash. App. 207, 61 P. 3d 352 (2002) (suspect kept a handgun in the bed).

The deputies needed a moment to secure the room and ensure that other persons were not close by or did not present a danger. Deputies were not required to turn their backs to allow Rettele and Sadler to retrieve clothing or to cover themselves with the sheets. Rather, "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Summers*, 452 U. S., at 702–703.

This is not to say, of course, that the deputies were free to force Rettele and Sadler to remain motionless and standing for any longer than necessary. We have recog-

nized that "special circumstances, or possibly a prolonged detention" might render a search unreasonable. See *id.,* at 705, n. 21. There is no accusation that the detention here was prolonged. The deputies left the home less than 15 minutes after arriving. The detention was shorter and less restrictive than the 2- to 3-hour handcuff detention upheld in *Mena.* See 544 U. S., at 100. And there is no allegation that the deputies prevented Sadler and Rettele from dressing longer than necessary to protect their safety. Sadler was unclothed for no more than two minutes, and Rettele for only slightly more time than that. Sadler testified that once the police were satisfied that no immediate threat was presented, "they wanted us to get dressed and they were pressing us really fast to hurry up and get some clothes on." Deposition of Judy Lorraine Sadler in No. CV–0206262–RSWL (RNBX) (CD Cal., June 10, 2003), Doc. 26, Exh. 4, p. 55.

The Fourth Amendment allows warrants to issue on probable cause, a standard well short of absolute certainty. Valid warrants will issue to search the innocent, and people like Rettele and Sadler unfortunately bear the cost. Officers executing search warrants on occasion enter a house when residents are engaged in private activity; and the resulting frustration, embarrassment, and humiliation may be real, as was true here. When officers execute a valid warrant and act in a reasonable manner to protect themselves from harm, however, the Fourth Amendment is not violated.

As respondents' constitutional rights were not violated, "there is no necessity for further inquiries concerning qualified immunity." *Saucier* v. *Katz*, 533 U. S. 194, 201 (2001). The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SOUTER would deny the petition for a writ of certiorari.

# SUPREME COURT OF THE UNITED STATES

LOS ANGELES COUNTY, CALIFORNIA, ET AL. *v.*
MAX RETTELE ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 06–605.   Decided May 21, 2007

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, concurring in the judgment.

This case presents two separate questions: (1) whether the four circumstances identified in the Court of Appeals' unpublished opinion established a genuine issue of material fact as to whether the seizure violated respondents' Fourth Amendment rights, see *ante,* at 4; (2) whether the officers were nevertheless entitled to qualified immunity because the right was not clearly established.  The fact that the judges on the Court of Appeals disagreed on both questions convinces me that they should not have announced their decision in an unpublished opinion.

In answering the first question, the Ninth Circuit majority relied primarily on *Franklin* v. *Foxworth*, 31 F. 3d 873 (CA9 1994).  As Judge Cowen's discussion of *Franklin* demonstrates, that case surely does not clearly establish the unconstitutionality of the officers' conduct.*   Conse-

——————

*See 186 Fed. Appx. 765, 767 (2006) (dissenting opinion) ("In *Franklin v. Foxworth*, 31 F.3d 873 (9th Cir. 1994), we found unconstitutional the officers' failure to provide clothing to a gravely ill man before exposing his genitals to twenty-three strangers for over two hours, under circumstances where there was no reason why the man was not given clothing.  *Id*. at 876–78.  We concluded that the detention was conducted in 'a manner that wantonly and callously subjected an obviously ill and incapacitated person to entirely unnecessary and unjustifiable degradation and suffering.'  *Id*. at 878.  Here, in contrast, Plaintiffs were not gravely ill, and their brief exposure, which lasted, at most, three or four minutes, was outweighed by the safety risks associated with allowing two occupants to remain in bed under covers during

quently, regardless of the proper answer to the constitutional question, the defendants were entitled to qualified immunity. I would reverse on that ground and disavow the unwise practice of deciding constitutional questions in advance of the necessity for doing so. See *County of Sacramento* v. *Lewis*, 523 U. S. 833, 859 (1998) (STEVENS, J., concurring in judgment). Accordingly, I concur in the Court's judgment.

—————

execution of a search warrant").